# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00179-CV

**Molly Spence, Appellant**

**v.**

**Matthew Davis, Appellee**

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-17-007624,
### THE HONORABLE JESSICA MANGRUM, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Molly Spence contends that the trial court abused its discretion in modifying the Agreed Order in Suit to Modify the Parent-Child Relationship. She challenges multiple findings of fact and conclusions of law. We will modify the order in part and affirm it as modified.

### BACKGROUND

Spence gave birth in March 2016 in California to a child fathered by Matthew Davis. The parents never married each other. In 2017, they entered and amended a California Stipulated Parentage Agreement. Spence and the child, followed by Davis, moved to Austin. In April 2018, Davis filed a petition to modify the Agreement's custody provisions. In April 2019, the child's guardian ad litem Dr. Kelley Baker recommended that Davis be appointed conservator with the exclusive right to designate the child's primary residence and to make psychological and psychiatric decisions.

In July 2019, the parties signed a Mediated Settlement Agreement (MSA) that was enforceable immediately as a contract. The MSA formed the basis for the trial court's Agreed Order in Suit to Modify the Parent-Child Relationship, signed October 18, 2019. The order named Spence and Davis joint managing conservators with the child to live in Travis County and neither parent empowered to designate the child's primary residence. It established standard possession for Davis beginning August 2019 expanding to an even split beginning in January 2021 with pickup and dropoff at school or, if school was out, at the South Congress Hotel. The order required that significant others not be present at exchanges of the child at the hotel and prohibited the parents from contacting the other's significant other. The order allowed the parents to designate a competent adult to pick up and return the child. The parents shared medical decision-making with the assistance of a parenting facilitator with the service provider to resolve remaining impasses. The order required the parents to participate in individual therapy. The order required the parents to communicate through Our Family Wizard (OFW) and to post all significant information about the child's health, education, and welfare on the site.

Davis filed a new petition to modify the parent-child relationship on June 19, 2020, alleging that the child's circumstances had materially and substantially changed. In his live petition, he asked that the parties remain joint managing conservators with him having the exclusive right to designate the primary residence of the child in Travis and contiguous counties until Spence moves outside of those geographic restrictions. He also requested to have all of the rights under Family Code section 153.132 after meaningful consultation with Spence and to have the exclusive right to schedule the child's medical and therapeutic appointments.

## APPLICABLE LAW

A trial court can modify the terms of a conservatorship order if (1) the child's or parties' circumstances have materially and substantially changed since the order was rendered and (2) doing so would be in the child's best interest. Tex. Fam. Code § 156.101(a)(1). The party seeking modification has the burden to establish these elements by a preponderance of the evidence. *Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied).

The movant must show what conditions existed at the time of the entry of the prior order, then show what material and substantial changes occurred. *Considine v. Considine*, 726 S.W.2d 253, 255 (Tex. App.—Austin 1987, no writ). The trial court is not confined to rigid rules or definite guidelines when deciding whether circumstances have materially and substantially changed. *Zeifman*, 212 S.W.3d at 589. The determination is fact- and case-specific. *Id.* at 593.

To determine the child's best interest, a court may use the nonexhaustive list of factors discussed in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). Those factors include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child, the stability of the home, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Id.* at 371-72. In the context of custody modification, other factors include the child's need for stability and the need to prevent constant litigation in child-custody cases. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).

We review the modification for a clear abuse of discretion. *Zeifman*, 212 S.W.3d at 587. A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or without reference to any guiding principle. *In re Marriage of Jeffries*, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). We consider whether the trial court had sufficient evidence on which to exercise its discretion and, if so, whether it erred in exercising that discretion. *In re W.C.B.*, 337 S.W.3d 510, 513 (Tex. App.—Dallas 2011, no pet.). A trial court does not abuse its discretion if some substantive and probative evidence supports its decision. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.).

Sufficiency of the evidence is not an independent ground of error but is a factor in determining whether the trial court abused its discretion. *Zeifman*, 212 S.W.3d at 587. In assessing legal sufficiency, we consider the evidence in the light most favorable to the court's order and indulge every reasonable inference that supports it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied). To assess factual sufficiency, we consider all evidence and determine whether the evidence supporting the order is so weak or so against the overwhelming weight of the evidence that the order is clearly wrong and manifestly unjust. *See City of Keller*, 168 S.W.3d at 822. Factually-sufficient evidence is necessarily legally-sufficient evidence. *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 252 (Tex. App.—Austin 2022, pet. filed).

We defer to the trial court's resolution of factual disputes and related credibility determinations; we may not substitute our judgment for the trial court's judgment in those matters. *George v. Jeppeson*, 238 S.W.3d 463, 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The factfinder can resolve inconsistencies in the testimony of any witness, draw inferences

4

from the evidence presented, and choose between conflicting inferences. *Lopez v. Crisanto*, 583 S.W.3d 926, 930 (Tex. App.—El Paso 2019, no pet.). An appellate court will not overturn a factfinder's inference unless the evidence supports only the opposite inference. *Id.* We presume that the factfinder resolved evidentiary conflicts in favor of the order if a reasonable person could do so. *See City of Keller*, 168 S.W.3d at 821. The trial judge can observe and assess witnesses' demeanor and credibility and can sense influences that may not be apparent from reading the record. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

A trial court's designation of items as findings of fact or conclusions of law is not controlling on appeal, and we consider the substance of the court's ruling even if it is incorrectly labelled. *Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 n.1 (Tex. 1979); *Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 640 (Tex. App.—Austin 2012, no pet.)

## DISCUSSION

Spence's sole issue on appeal is "[w]hether the trial court abused its discretion in modifying the parties' MSA."[1] In support of that issue, she makes several arguments and challenges many findings of fact and conclusions of law. She contends that the trial court abused its discretion by modifying the MSA because the issues and circumstances on which Davis based his request to modify predated or were anticipated in the MSA that supported the 2019 Order. She also argues that Davis failed to show changed circumstances because he did not adduce

---

[1] The mediated settlement agreement (MSA) and the 2019 Order are sometimes referred to interchangeably by the parties. The MSA is an agreement between the parties and signed by the parties on July 2, 2019, that states that its provisions "shall be effective immediately as a contract." *Cf.* Tex. Fam. Code § 153.0071(d) (when MSA binds parties). While the 2019 Order expressly incorporates agreements reached by the parties in mediation on July 2, 2019, it is an order signed by a judge and subject to modification by a court. *See id.* § 156.001.

5

evidence of the baseline circumstances existing at the time of the 2019 Order. She further argues that the evidence was legally and factually insufficient and was not based on personal knowledge and therefore was too speculative, conclusory, and irrelevant to support a modification.

We will assess these arguments as they apply to the trial court's conclusions on the elements required to support modification of an order establishing conservatorship or possession and access, namely: Conclusion 5 that there has been a material and substantial change in circumstances since the parties signed the MSA in July 2019 and Conclusion 6 that modification of the 2019 Order is in the child's best interest. *See* Tex. Fam. Code § 156.101(a).

## I.    Credibility

Spence contends that there is legally or factually insufficient evidence to support Finding 10 that "at times, MOLLY SPENCE was not a credible witness for several reasons including, but not limited to" Spence's history of fostering relationships by telling "significant falsehoods about herself;" giving "false information to others, especially romantic partners, about her personal history;" and exaggerating or inventing a British accent. Spence challenges that finding and contends that, through therapy, she has changed her ways.

But the trial court as factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses, and we cannot substitute our judgment for the factfinder's assessment of witness credibility. *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005); *Protect Envtl. Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 539-40 (Tex. App.—El Paso 2013, pet. denied); *In re P.A.C.* 498 S.W.3d 210, 214, (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Spence's assertion that the trial court did not rule in the courtroom that she was not credible does not negate Finding 10. Spence does not cite and we have not found authority holding that the

6

absence of a credibility finding in open court bars a post-hearing finding that her testimony lacked credibility. Spence's assertion that Davis knew of her lies and embellishments when he signed the MSA and therefore that her subsequent lies are not a material and substantial change in circumstances does not affect the trial court's finding about her credibility as a witness. We may not substitute our assessment of the trial court's credibility determination in Finding 10.

## II. Material or substantial change in circumstances

In Conclusion 5, the trial court stated that a material and substantial change in circumstances occurred after the parties signed the MSA in July 2019.

### A. Evidence of conditions in 2019 and changing circumstances

Contrary to Spence's assertion on appeal, we find factually sufficient evidence of the child's status at the time of the MSA and 2019 Order. Dr. Melissa Bunner's June 2021 report on her neuropsychological examination of the child provided background information. Baker, the child's guardian ad litem in 2018-19, testified regarding the child's circumstances in 2019. Mary Ann Howell, the child's teacher in 2020-21, testified about the child's progress during that year, providing a basis for inferences regarding the child's condition in 2019. Marisa Crouse testified about the child's progress in occupational therapy beginning in March 2019 as well as some of her interactions with the parents.

There are no disputed findings regarding Bunner's report. It provides evidence about the child's history and his changing needs. Bunner wrote that he began school at two-and-a-half years old at a play-based outdoor school but was asked to leave when he was three-and-a-half years old because he was disruptive; he was three and a half in September 2019 after the

7

MSA was signed. He moved to the school where Howell taught, then started public-school kindergarten after Bunner examined him.

Bunner made several recommendations geared toward easing the child's transition to kindergarten. She said he would need continued occupational therapy, speech therapy, and social skills training. She noted that he had coordination issues despite his therapies that would make school "quite difficult" and that his visuospatial issues could be problematic as the school demands increased in their complexity. His vocabulary and narrative memory were superior, but he performed inconsistently on tests and had difficulty with task persistence. She said that his difficulties with social communication seemed to be easing with therapy but bore monitoring as the demands on him increased. She recommended increased occupational therapy working on pre-writing skills and recommended developing a plan for occupational therapy in school if he did not show a lot of improvement over the summer. She suggested that school might be frustrating the next year, particularly if the school had high academic expectations. She said that because he was entering kindergarten, it would be increasingly important for teachers and parents to have consistent messaging and plans and that whenever possible the parents should attend meetings together and share emails and notes.

Though Baker's 2019 report on the child was not admitted into evidence,[2] she testified at the 2021 hearing that Spence and Davis were having difficulty coparenting at the time

---

[2] Dr. Kelley Baker made a report in 2019 before the MSA. Though that report was in the clerk's record attached to prehearing motions, it was not offered or admitted at the hearing. Accordingly, we cannot consider it in our review of the court's 2022 Order. *See Celadon Trucking Servs., Inc. v. Titan Textile Co.*, 130 S.W.3d 301, 307 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Noble Expl., Inc. v. Nixon Drilling, Co.*, 794 S.W.2d 589, 592 (Tex. App.—Austin 1990, no writ). Nevertheless, her testimony addressing some of her observations provides a baseline against which to assess subsequent changes in circumstances.

of the MSA. She recommended and the court ordered that the parents use a parenting facilitator to help bridge their communication issues. Baker testified that her primary concern was that Spence would continue to distort Davis's parenting abilities and his relationship with the child, presenting false facts to professionals and the child. Baker testified at the 2021 hearing that she had thought in 2019 that it was very important that Spence engage in fairly significant individual therapy to explore why she formed relationships with people based on lies about herself and why she lied about Davis. Baker testified that the therapy was essential to change her relationships and recommended equal possession of the child with the expectation that Spence would improve. Baker testified that Spence would need to improve to be a healthy parent and make the evenly split possession work. Baker said she did not have specific concerns about Spence contacting the police about violations of court orders.

Finding 11(c) states that Baker's "primary concern at the time of signing the mediated settlement agreement in July 2019 was MOLLY SPENCE's continued distortion of facts and false realities to others in her life and in the child's life;" this included presenting false facts about herself and her background to the child, romantic partners, and Davis. Baker said that her concerns about Spence's distortions about Davis centered on presenting false facts to professionals or the child himself. She described as very important Spence's need to engage in fairly significant therapy to assess why she was telling others significant in her life false information about where she was born or lived. Finding 11(c) is supported by factually sufficient evidence.[3]

---

[3] Spence also challenges Findings of Fact 11(a), (b), (d), and 12.

Crouse provided occupational therapy to the child beginning in March 2019 working on fine, visual, and gross motor control and adaptive responses to sensory input. She testified that he has made progress and recommended a reduction in the frequency of his sessions

---

Finding 11(a) states that Baker recommended increased possession for Davis "with the understanding that MOLLY SPENCE would improve and be a healthy parent to the child." Spence asserts that insufficient evidence supports a finding that Baker "only recommended 50/50 possession *based on the goal* that Molly would improve with therapy." (Emphasis added.) No finding of fact states the proposition that Spence disputes, and factually sufficient evidence supports Finding 11(a).

Finding 11(b) states that Baker signed the MSA which "significantly formed the basis of" the 2019 Order. Spence is correct that the clerk's record shows that Baker signed the 2019 Order based on the MSA, not the MSA itself. Which document Baker signed does not affect our review of whether the trial court abused its discretion by modifying the 2019 Order.

Finding 11(d) states that "Baker was of the opinion at the time of the first modification that individual therapy for MOLLY SPENCE was an essential part of Dr. Baker's recommendations and was expected in order for the equal possession schedule to work and for MOLLY SPENCE to become a healthy parent to the child." Baker testified that she recommended 50/50 possession and expected that Spence would get better, that Spence "would need to get better in order for such a schedule to be workable," and that Spence "would need to get better in order to be a healthy parent" to the child. Factually sufficient evidence supports the finding regarding Baker's opinion.

Finding 12 states that

The Court heard evidence and found that MOLLY SPENCE engaged a therapist that was not on the recommended list from the psychological evaluation, did not start therapy for six months following Dr. Baker's recommendation, and her chosen therapist reportedly did not believe MOLLY SPENCE required the therapy recommended by the psychological evaluator.

Spence contends that no evidence supports a finding that Spence's therapist cleared her of continued therapy or that Spence abandoned her therapy. The court did not make such findings. Factually sufficient evidence supports Finding 12.

10

from twice a week to once a week. Spence challenges several findings about Crouse's testimony.

Spence challenges Finding 14(h) that "the child would be more likely to run away from the computer and hide or cry" during virtual therapy appointments while the child was at Spence's house. Spence contends that it is not unusual for a 4-year-old to have challenges during a virtual therapy appointment, that Crouse did not testify that challenges did not occur at Davis's house, and that this difference is a difference in parenting that is not sufficient support for modifying the parties' MSA. Spence's assertion about what is usual for a 4-year-old or that any difference was due to a parenting style is not part of the challenged finding, nor did the court find that the child had no problems at Davis's house. Finding 14(h) is consistent with Crouse's testimony that the child was *more likely* to run away at Spence's home. This finding is similar to Finding 14(f) that the child was more dysregulated, sought out sensory input more, and had more difficulty controlling his body and where it was in space when Spence brought him to appointments. It is also consistent with Finding 14(g) that he needed more redirection, had more difficulty focusing, and made less progress when brought by Spence than when brought by Davis.

Spence challenges Finding 14(i) that Spence reported the child having difficulty with grooming tasks more than Davis did; this finding accurately describes Crouse's testimony. Spence contends that this testimony was not tied to a specific date, but it immediately followed a question about the parents' annual reports of the child's progress, which first occurred in March 2020. Crouse noted discrepancies between the parents' assessments of the child's behavior. Davis reported that the child could brush his teeth independently, while Spence reported sensory difficulties, meaning that he would not put the brush in his mouth. Crouse described Davis's

11

observations of the child's progress as more accurate or consistent with her observations than was Spence's reporting. Even if it did not show a change in circumstances, this finding of a discrepancy between the child's performance of skills with each parent and/or the parent's reporting of those skills is relevant to the best-interest conclusion discussed below. This finding is consistent with Crouse's testimony and Finding 14(j) that Davis's observations of the child's skills were more consistent with Crouse's observations.

Spence challenges Finding 14(e) that Crouse observed that Davis is more likely to communicate about the child's progress than Spence on grounds that it conflicts with testimony that both parents turn in annual progress notes. The fact that Spence communicates with Crouse does not disprove that Crouse testified that Davis was *more likely* to communicate with her. Indeed, the finding is sufficiently supported by Crouse's response to the question "how do you know that Dad is doing more of the home carryover [of strategies, skills, and techniques practiced during the therapy sessions] in his house?" Crouse responded, "There's more parent report and also e-mails regarding [the child's] progress sent to me." The finding is further supported by Crouse's testimony that Davis, but not Spence, reached out to her following Bunner's examination. Spence challenges Finding 14(n) that "[t]he most important component to seeing progress with occupational therapy is home carryover of strategies, skills, and techniques practiced during therapy sessions, which the Court found could be best met in MATTHEW DAVIS's home." Spence dismisses this finding as mere surmise and based on Davis's being a better communicator, but the finding is sufficiently supported by Crouse's testimony based on her observations of the child's performance in therapy sessions and impressions developed while treating the child.

12

Mary Ann Howell, the child's pre-kindergarten teacher, testified regarding the child's progress from September 2020 through August 2021. While she did not testify regarding his skills and nature in 2019, her testimony provided information regarding the child's changing circumstances over the 2020-21 period and some indications from which the court could infer changes from 2019. Howell testified that the child generally had challenges with interacting with other children. He had a tendency to physically contact other children when he wanted to interact with them rather than asking; he did not seem to understand it was inappropriate. Howell testified that the child was more engaged overall by the end of the year but that there was still a noticeable difference in his behavior depending on which parent brought him to school.

The divergence in the child's behavior depending on which parent brought him in grew over the course of his year with Howell. She testified that the child was "truly a different personality" depending on which parent brought him to school, supporting Finding 13(e). Howell testified that the school preferred that children not bring an item from home but made an exception for this child. If Spence brought him, he carried an object like a stuffed animal and would be reluctant to put it away; he would go through a dialogue about the animal with whoever greeted him at the door, which supports Finding 13(f). By the end of the year, the child did not bring an object from home when Davis or his fiancée, Margaret Paulson, brought him. On the playground, he would stand by himself when Spence brought him but would move around the playground when Davis brought him. The child was more concerned that he be ready to leave when Spence was picking him up. Howell testified that the child needed time to warm up and re-engage with the class after vacationing with Spence, but there was no re-entry phase after a vacation with Davis.

Spence also challenges the court's Finding 13(h) that "Howell observed that MOLLY SPENCE was not as involved with the child's pre-kindergarten as MATTHEW DAVIS." When asked how involved Spence was, Howell responded, "Not as involved because frequently I get with the father over the fence." Howell explained that while COVID restrictions prevented parents from entering the classroom, she interacted with parents over a playground fence and "I did meet his father more than his mother, and that was just because I'm sure of her work schedule." Spence also challenges Finding 13(i) that Howell believed that having joint conferences with the parents was not productive due to Spence's being upset and insisting that the conference end, causing Howell to forgo joint conferences. Spence explains why she was upset, but Finding 13(i) is a finding of what "Howell believed," not whether Howell's belief was justified. Factually sufficient evidence supported Findings 13(h) and 13(i).

## B. Police calls

Spence challenges findings of fact regarding her calls and threats to call law enforcement, all of which occurred after the 2019 Order:

- Finding 14(l): Spence "called police to the child's occupational therapist's office. This was disruptive to the therapist's office."

- Finding 15: Spence "repeatedly and unnecessarily involved or threatened to involve law enforcement during exchanges of possession of the child and in matters that did not warrant law enforcement involvement"

- Finding 16: Spence was "untruthful to law enforcement officials."

Davis testified that Spence called or threatened to call the police half a dozen times, while Spence argues that Finding 15 is not supported by factually or legally sufficient evidence

because she called the police only four times, the police appeared only twice, and the child was present only once. Sufficient evidence supports the findings.

The first incident occurred on August 18, 2019, a few weeks after the parties signed the MSA that extended Davis's possession to standard possession beginning August 1, 2019. The MSA, signed July 2, 2019, states that it is "effective immediately as a contract [and] shall supersede any temporary orders or other agreements of the parties with respect to the subject matter hereof." The MSA called for the exchange to occur at school, which had not begun, with a fallback of the South Congress Hotel. Nevertheless, Spence asserted that she would pick up the child from Davis's home under previous arrangements. She asserted that the MSA was not effective because it had not been approved by a judge. Davis responded that the attorneys had agreed to an exchange the next morning at 9 a.m. at the child's therapist's office instead of 8 a.m. at the hotel. Spence asserted that her attorney did not agree and that she would pick the child up under the pre-MSA order. She called police to Davis's condominium where they waited in the building lobby. Davis allowed Spence to take the child.

Spence threatened to involve police on September 21, 2019, when she had a FaceTime call with the child and did not recognize the background. She accused Davis of having visitation somewhere other than the address listed in their court order, taking the child somewhere else without notice, and not giving notice of change of residence. She asked, "Do I need to call the police to attempt to locate where you've taken our son?" Davis responded that the child was with him at his home, giving the address that he said she was told of at their July 2, 2019 mediation when they were discussing schools.

On November 22, 2019, Davis had a work commitment and told Spence that Paulson would be taking the child to his therapy appointment. Spence did not like that because

15

she did not want contact with Paulson; Spence suggested she might call police to be present because Davis's plan violated their 2019 Order. Davis denied that Paulson's taking the child to therapy violated their order and suggested that he could take the child to the hotel at 8:30 a.m. before his work commitment. Spence replied that she would be at the therapist's office with Austin police officers. Davis suggested that Spence could wait to go to the therapist's office until after Paulson left the child, which would avoid disruption of the therapist's office and trauma to the child. Spence responded that the child "loves firemen and policeman and EMS. He knows they're helpers." Davis responded by recapping the options he had presented, wondering why Spence had chosen the most disruptive option, and telling her that he had chosen the least disruptive option of taking the child to school instead of therapy. Spence responded, "Keep your emotional outbursts and fabrications to yourself. They can't be good for your health. Many thanks." What neither party knew was that Spence's call to the police resulted in police appearing at the therapist's office, which Crouse said disrupted their work.

On March 30, 2020, Spence was late for their 8 a.m. exchange at the hotel. Davis sent an OFW message at 8:17 a.m. telling Spence they were leaving the hotel to avoid further exposure to the virus during the early weeks of the declared pandemic. Spence responded by apologizing and asking for a 9 a.m. exchange, but Davis had a work call that he needed to join; he later explained that the call was a rehearsal for a presentation in which he played a major and critical role. He offered that Paulson could take the child at 9 a.m. to deliver the child to Spence or someone she trusted or that Davis could make the exchange at 11:15 a.m. Spence suggested a constable escort to facilitate a 10 a.m. exchange. Davis asserted that police involvement was not necessary because it could traumatize the child. Spence again asserted that, because the child saw police as helpers and seeing them would not traumatize him, she would call the police to

16

come to Davis's home "and help facilitate visitation exchange where it is supposed to be." When Davis wrote that Spence's message was unclear and recounted the options he had presented including adding some "makeup time" to the end of Spence's possession, Spence responded at 9:48 a.m. that Davis's offered 11:15 a.m. exchange was three hours late "which I find unreasonable, and APD finds unreasonable. They're willing to send an officer to your house to talk to you about following our court order. They stand by." According to a police report from that date, Spence called the police at 10:12 a.m. and asserted that Davis failed to appear at the hotel at 8 a.m. because he had a phone call to take; there is no indication whether the police went to the hotel. The accusations in the police report attributed to Spence conflict with her OFW messages to Davis. The exchange occurred at the hotel at 11:15 a.m. without incident.

Spence asserts that the child never saw the police and that she has not called the police since the parenting facilitator has been involved. Neither of these assertions addresses the fact that factually sufficient evidence supports Findings 14(l), 15, and 16.

## C. Infantilization

Spence challenges Findings of Fact 27, 28, and 29 regarding Spence's actions affecting the child's progression in breastfeeding, toilet training, crib sleeping, and thumbsucking and regarding their effects on the child. She also contests Finding 11(e) that former guardian ad litem Baker was aware of concerns about infantilization in 2019 but that these were not significant issues because the child was too young for infantilization to be a concern in 2019. Spence contends that the fact that Davis in 2019 had concerns about infantilization means that infantilization in 2021-22 was not a changed circumstance. This argument ignores the fact that circumstances that are age-appropriate for a three-year-old could be inappropriate for a six-year-

17

old and could constitute a materially and substantially changed circumstance. Factually sufficient evidence supports Finding 11(e). We will examine evidence supporting findings regarding infantilizing behavior.

### 1. *Breastfeeding*

Finding 27 summarized testimony about indications that Spence continued to breastfeed the child while telling the child to tell others that he is not being breastfed. The court found "credible concerns that MOLLY SPENCE encourages the child to say he is not breastfeeding. This negatively affects the child's development, as it creates confusion for the child."

Spence testified that the child stopped nursing in September 2019. Her fiancé, Shawn Lloyd, testified in his July 2021 deposition that he has never seen Spence nurse the child. He testified that the child asks to breastfeed and Spence tells him no and that they have not done that for a year. Lloyd testified that the child cries but says he is okay with Spence's response.

Davis testified that he suspected the child is still breastfeeding. He testified that he had not seen the child breastfeeding recently but that the child frequently touched Paulson's breasts indicating a desire to breastfeed. Paulson testified that the child tries to touch her breasts, points at his mouth, then her breast, and then back to his mouth, and has tried to put his mouth over her nipple through her shirt. She said he had engaged in that behavior within three months of the November 2021 hearing. Paulson testified that the child also has touched the babysitter's breasts and talked about "nursies" as something that he is doing with his mother at night. Davis testified that he was concerned that Spence claimed she had stopped breastfeeding but had not and was instructing the child to hide that fact.

18

While Howell testified that she had no direct knowledge that Spence was breastfeeding the child, Howell said she was concerned by indications that breastfeeding continued because a previous student who was nursing had a difficult transition to kindergarten.

Forensic psychological expert Alissa Sherry[4] testified that, in the dominant culture here, most mothers wean their children from breastfeeding by age two and that mothers who continue beyond that time (1) often serve their own need for comfort and security and feeling loved and wanted by their child and (2) send a message that the child is not safe to explore outside the mother-child relationship. Sherry testified that, when a child is doing one thing, but a parent says that another thing is happening or tells the child to tell others that another thing is happening, it confuses the child and causes them to be insecurely attached to the parent.

Factually sufficient evidence supports Finding 27.

### 2. *Other infantilizing behaviors*

In Finding 28, the court found,

> The Court heard evidence through testimony of MATTHEW DAVIS and documentary evidence supporting concerns that MOLLY SPENCE kept the child in a diaper many months after he was toilet-trained, kept him in a crib for an extensive period which made it more difficult for him to use the bathroom at night after he was toilet-trained, and supported the child in continuing to suck his thumb and in other ways act and behave younger than his years.

Davis testified that, when signing the MSA, he had not been concerned about how Spence was handling the child's transition from toddlerhood but that concerns arose as the child entered what Davis called a critical development period. For example, Davis said he was not concerned when

---

[4] Sherry did not meet with the child, Spence, Davis, or any of the family members or witnesses but did testify that she read depositions of Davis, Spence, and two of Spence's companions, plus Baker's report, forensic psychologist Dr. Daphne Ainslie's pre-MSA evaluations of the parties, and some other exhibits.

the child was three years old and sleeping in a sleep sack in a crib, wearing diapers, and breastfeeding, but his concerns grew when Spence did not share his concern regarding the timeline for phasing out those behaviors. Spence concedes in her brief that Davis transitioned the child out of a crib several months before she did. Spence testified that the child was in a crib converted to a toddler bed by July 2019; Davis testified that he last saw a crib in Spence's home in a FaceTime call in December 2019.

Davis testified that the child was potty-trained at his house a year before Spence reported that the child was potty-trained at her house.[5] In December 2019, Davis asked Spence why the child arrived at his home wearing a diaper and said the child expressed embarrassment when Davis pointed out the diaper; Spence said she allowed the child to pick out his clothes. Davis reported to the child's pediatrician in March 2020 that the child was 90% potty-trained. In May 2020, Davis reported to Spence by OFW message that the child said in a FaceTime call that he was wearing a diaper before the call and did not seem to know where to find his underwear. Davis also reported that the child had weeks previously said he got a diaper rash when he pooped while wearing a diaper. Davis stated in the OFW message that the child had not used diapers at Davis's home in at least a year or pullups for many, many months. Spence testified that the child was fully potty-trained at her home by June 2020. Davis testified that Spence reported in the fall

---

[5] Spence did not object to Davis's testimony at trial; her appellate complaint under Texas Rule of Evidence 602 that Davis lacked personal knowledge of whether the child had been wearing a diaper or got diaper rash when he pooped while wearing a diaper was not preserved and cannot be raised for the first time on appeal. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a). Similarly, Spence did not preserve her appellate complaint that Davis's testimony that he "believed" that Spence reported by OFW message that the child was potty-trained in the fall of 2020 was inadmissible.

of 2020 that the child was potty-trained at last, though he offered no OFW message or email to that effect.

Both parents tried to curb the child's thumbsucking albeit through different methods. Davis said that he brought it up as an issue in January 2020 and suggested using a bitter nail polish in April 2020 but that Spence did not agree; he said they agreed to try putting bandaids on the child's thumb to dissuade him. In May 2021, Spence sent Davis a message accusing him of coaching the child to believe that he deserves to be called a baby because he had not stopped sucking his thumb. In messages in August 2021 preparing for a dental appointment, Davis asked Spence to bring up thumbsucking and to get advice on how to curb it and offered to join the appointment. Spence replied that she would bring it up with the dentist and asked Davis to discontinue attempting to intervene in her parenting time for routine events like doctors' checkups. After the appointment, Spence reported that the dentist suggested putting bandaids on the thumbs at night. Davis agreed that bandaids were a good idea and suggested not redirecting the child because that could cause shame; he asked if Spence would consider using bitter nail polish if bandaids did not curb the habit. Spence replied that her redirection involved discussing why the child was thumbsucking and what he might do instead. Spence said that the dentist recommended against the nail polish, but Davis testified that when he called the dentist's office he was told that the dentist had recommended trying the nail polish as a last resort before putting an apparatus on the child's hand. The parenting facilitator testified that thumbsucking treatment was a subject of disagreement in October 2021. Spence testified in November 2021 that she would consider the bitter nail polish if the child continued to suck his thumb.

Factually sufficient evidence supports Finding 28.

21

### 3. *Sherry's opinion on infantilization*

Spence does not challenge the substance of Finding 29 that summarized Sherry's testimony that infantilizing the child can cause him "to feel and think as though he needs his mother to feed himself, go to the bathroom, to be comforted, etc.," which the court found to be an unhealthy message. Instead, Spence contends that Sherry's evidence is inapplicable, irrelevant, and unhelpful because there is insufficient evidence of infantilizing. Spence did not raise the relevance objection at trial. Having concluded that sufficient evidence supports the findings that Spence engaged in infantilizing behavior, Spence's complaint that Sherry's evidence and Finding 29 are inapplicable and irrelevant fail.

The trial court did not abuse its discretion by determining that the facts underlying Findings 27 and 28 mark a substantial and material change in circumstances because, while infantilizing behaviors were not a concern in 2019 when the child was three years old, they became a problem when they persisted as the child grew older.

### D.    Pre-existing conditions and anticipated changes

Spence contends that her embellishment of facts about her life after the 2019 Order was not a change from conditions at the time of the MSA or the 2019 Order. She contends that the MSA and 2019 Order show that her behavior was expected to continue to some extent while she underwent therapy. She argues that, if a change in circumstances was contemplated by the parties to such a degree that it was factored into the order or agreement, the realization of that anticipated change may not constitute a material and substantial change. *Zeifman*, 212 S.W.3d at 587, 593 (child's aging was not alone material and substantial change; order anticipated child's aging and established dispute-resolution proceeding for school choice); *Wiese v. AlBakry*, No. 03-14-00799-CV, 2016 WL 3136874, at *4 (Tex. App.—Austin Jun. 1, 2016, no pet.)

22

(mem. op.) (children's aging and starting school was anticipated and is not alone material or substantial change in circumstance).

Spence challenges Findings 20-23 on grounds that the poor communication between her and Davis was not a material and substantial change in circumstances. While Spence and Davis's communication issues plainly predate the 2019 Order, Davis testified that their coparenting and the intensity of her disparagement of him had gotten worse since the MSA. Factually sufficient evidence supports the court's Finding 20 that Spence's communications to Davis were often inappropriate, misleading, or factually inaccurate in contrast to Davis's appropriate communications; Finding 21 that Spence taunted and threatened Davis through OFW messages and refused to call him Matt despite his repeated requests that she not call him Matthew; Finding 22 that Spence got Instagram to remove Paulson's account because she did not consent to her posting pictures of the child; and Finding 23 that Davis unsuccessfully attempted for the most part to collaborate with Spence about parenting issues on OFW.

The trial court had before it sufficient evidence on which it reasonably determined that circumstances, including the child's development, materially and substantially changed in ways that were not built into the 2019 Order. While the parties expected the child to age, factually sufficient evidence supported finding that actions by Spence—creating an environment that diminished the child's capacity to participate in therapy, delaying developmental milestones, lying, and calling police in the absence of danger—constituted a material and substantial change in circumstances, particularly as those actions intersected with the developing child's needs. The child continued to need therapy and his educational environment was getting more structured. Evidence showed that he engaged in therapy and school more productively when staying with Davis and that Davis more accurately assessed and reported the child's progress. Spence did not

23

show that the trial court abused its discretion by concluding in Conclusion 5 that circumstances had materially and substantially changed since the July 2019 MSA and that they had materially and substantially changed since the 2019 Order.

## III.     Child's best interest

In Conclusion 6, the trial court stated that modification of the 2019 Order is in the child's best interest.  Spence challenges that conclusion and argues that legally and factually sufficient evidence do not support Finding 9 in which the court found that the child has significant social, behavioral, and emotional needs that Davis can best meet.[6]

The testimony of the child's pre-kindergarten teacher and his occupational therapist supports the finding that the child's needs are better met by Davis.  As set out above, Howell testified that the child was "truly a different personality" depending on which parent brought him to school, with more signs of anxiety on Spence's days.  By the end of the school year, the child continued to need a stuffed animal from home when brought by Spence but did not bring one when Davis or Paulson brought him.  After a vacation with Spence, the child needed time to warm up and re-engage with the class, but there was no re-entry phase after a vacation with Davis.  Spence unsuccessfully challenges some findings about Howell's testimony.

Crouse reported similar differences in the child's behavior.  She testified that the child was more dysregulated when Spence brought him, sought more sensory input, had more

---

[6] Spence also asserts that the substance of Finding 9 does not show a material and substantial change in circumstances.  While the child's issues may not be a change in circumstances, the parties agreed and the court found that the 2019 Order was in the child's best interest, including its provisions stepping up to evenly split possession and fully shared decision-making.  As we have held, factually sufficient evidence supports a finding of changed circumstances as the child developed and the effects of each parent's guidance began to manifest in the child's behavior.  Thus, Davis's meeting his needs better is a changed circumstance.

difficulty controlling his body, needed more redirection to task, and had more difficulty focusing, supporting Findings 14(d) and 14(f). The child got more done and could progress through more skills on days that Davis brought him, supporting Finding 14(g). Crouse testified that similar results occurred when the therapy was remote due to the pandemic. He had more difficulty participating at Spence's house, was more reluctant to engage in therapy, and frequently ran away from the computer to hide or cry. The child was able to have productive appointments when staying with Davis, supporting Finding 14(h). The child was able to get haircuts with Davis at a barbershop but struggled to complete them with Spence and could have his toenails clipped and could brush his teeth independently at Davis's home but was still "getting used to" nail clipping and had sensory aversion to toothbrushing (meaning an aversion to the toothbrush in his mouth) at Spence's home, supporting Finding 14(i). Crouse testified that Davis's assessment of the child's abilities was more in line with her observations. She testified that it was important for the child to have congruence between the households to progress toward his goals. She testified that dysregulated children will walk on their toes to soothe themselves; Paulson testified that the child walked on "tippytoes" a lot after staying at Spence's house. Factually sufficient evidence supports these findings.

Spence challenges Finding 13(g) that "[t]he Court was aware that MATTHEW DAVIS' equal possession schedule with the child coincided with the period in which significant improvement was seen by Ms. Howell." Spence contends that there is insufficient evidence that the improvement was "because Matthew was getting equal possession time." The Court found coincidence, not causation, in Finding 13(g); even if it found causation, the evidence of a noticeable and growing divergence in the child's behavior also supports a causal link.

25

Sherry's testimony about the effect on a child of living with an adult who lies reasonably explained the difference in the child's behavior. She testified that living with adults who regularly lie creates a false sense of reality during a developmental period in which children are trying to understand the world. Children recognize that the liar is telling the world one thing but living another, and those children stop trusting their ability to perceive the world around them. She said that living in an alternate reality makes it hard for a lying parent to be attuned to the child's needs and causes an insecurely attached child. Sherry also testified that a child who is insecurely attached to a parent would have distress at separation from the parent and will developmentally regress; the child might act younger than expected and might act more aggressively with other children or might shut down and avoid contact with other children. She testified that having police show up at an exchange when not needed signifies to the child that they should be afraid when fear is not required. Finding 30 regarding Sherry's testimony is supported by legally and factually sufficient evidence.

Evidence supporting Findings 17 and 18 that Spence was untruthful to Davis about the nature of Doug Zell's relationship with her and the child is evidence of the type of discrepancy between statements and observed reality that could create the insecurity that manifested in the child's dysregulation described by witnesses. Davis testified at trial that Spence told him in July 2019 that Zell was her boyfriend, that they were coparenting and trying to conceive a child together, and that Zell was going to be her partner. In an October 2019 OFW exchange, Davis wrote that he was glad to hear that "things are going well with you and Doug;" asked if Doug would be put on the school pickup/dropoff list; speculated that at some point they would be at school for a function; and wrote, "I'm sure you know this but I just wanted to reconfirm that I look forward to making his acquaintance and it will be very cordial and chill."

26

Spence replied, "To be quite frank, Doug and I believe that though he is my partner, and a part of [the child]'s life, there exists a pretty high risk to his profile with you or Margaret [Paulson] having access to him in any way." Spence later filed a motion for enforcement in part because Davis went to a café owned by Zell, whom she described as her significant other. At another time, she told Davis that Zell would step out of the room during Davis's Zoom calls with the child.

But Zell testified in his deposition that he considered his relationship with Spence casual, that Spence was not his girlfriend, and that they were not trying to integrate their lives and conceive a child. He testified that he saw the child only at the café and was not formally introduced to him, was not present at Spence's home during the child's Zoom calls with Davis, was not coparenting the child, and did not recall discussing his daughter with Spence. He also said he did not object to Davis's coming to the café because Zell "like[s] paying customers." He did not know that Spence sought judicial action to bar Davis from coming to the café.

At trial, Spence clarified that she and Zell were not intentionally trying to have a child, but that her statement was "not a complete lie" because unprotected sex could have led to conception. She also said that Zell was a coparent through conversations about their children but did not coparent the child in person. She testified that she was surprised that Zell did not describe her as his girlfriend.

When Spence's fiancé Lloyd was to pick up the child in August 2020, Spence refused to give his contact information to Davis. At trial, Spence testified that Lloyd told her he did not want Davis to have his contact information; she said Lloyd had Davis's information and could have called him if needed. At his deposition, however, Lloyd had testified that it would be important for a parent to have the contact information of a person picking up his child. He said

27

he did not know that Davis asked for his information and that Spence refused to provide it. Lloyd testified that he did not remember if he told Spence that he did not want Davis to have his information because Lloyd felt unsafe; he testified that he was more focused on being on time.

There was other evidence that Spence embellished the truth or lied about her background, education, and employment history to Lloyd. While this behavior generally may not be a changed circumstance since the 2019 Order, it is relevant to the determination of the child's best interest. Factually sufficient evidence supports Findings 17, 18, and 19.

Spence testified that she regrets some of her actions and is working in therapy on telling the truth. She testified that she feels like she can now interact respectfully and peacefully with Davis and Paulson regarding coparenting.

Sufficient evidence supports the trial court's Finding 26 that Spence's untruthfulness increased parenting conflicts with Davis and played a significant part in causing this litigation.[7] Spence's apparent lies to the police (that Davis failed to appear with the child at the appointed time at the hotel) and to Davis (that she had called the police and that they agreed with her and were standing by) surrounding the March 30, 2020 exchange and Spence's embellishment of her relationship with Zell leading to her motion to enforce the non-contact provision of the 2019 Order provide plain support for Finding 26. There is no evidence that her untruthfulness eased parenting conflicts or had no role in causing Davis to seek modification.

---

[7] Finding 26 also states that Spence's untruthfulness had negative effects on her personal and social relationships. Because that portion of the finding does not bear directly on the issues required to modify the 2019 Order, we need not explore the support for that aspect of Finding 26.

More critically, sufficient evidence supports Finding 25 that Spence's untruthfulness indicates her inability to put the child's needs before her own, including as shown by the following incidents:

- her communications to Davis and police on March 30, 2020;

- her description of Davis to the parenting facilitator as someone delusional who fabricates situations, as found in Finding 24, was inconsistent with the facilitator's observations;[8]

- her threat to call police when she did not recognize the background of a FaceTime call claiming incorrectly that Davis had not told her his new address; and

- her description of Zell as her boyfriend and coparent that formed the basis of her enforcement action against Davis;

While Spence may have put the child's interests first in other situations, these incidents support the trial court's finding that Spence more than once was unable to give precedence to his needs.[9]

In sum, factually sufficient evidence supports concluding that the trial court did not abuse its discretion by determining that the emotional and physical needs of the child now and in the future, the parental abilities of Spence and Davis, and the acts or omissions of a parent

---

[8] Spence testified that Davis manipulates truth, but flatly denied reporting to the parenting facilitator on the intake form that Davis is delusional and fabricates situations. When shown the parenting facilitator intake form on which she described Davis's behavior as "erratic and delusional" and wrote that he "shows a deep willingness to fabricate situations and instances to victimize himself and to portray me as erratic" and "has fabricated agreement between attorneys that have not taken place," Spence testified, "I thought we were talking about Dr. Ravenscroft's intake papers, not Leslie's," and "I do not remember writing that, but it seems that I did."

[9] While not directly related to dishonesty, sufficient evidence supported Finding 14(m) that she video-recorded within the child's sight when Paulson brought the child to therapy. Crouse agreed in testimony that the recording was "a little bit distracting to the office" which is not in the child's best interest.

support the modifications to the 2019 Order. *See Holley*, 544 S.W.2d. at 371-72. Factually sufficient evidence supports both Finding 9 and Conclusion 6.

## IV.   Modifications of the order

The trial court modified the 2019 order by awarding Davis:

- greater time of possession than the standard possession order awards;

- exclusive decision-making rights after meaningful consultation with Spence on matters such as consent to psychological treatment, consent to invasive medical treatments, education, legal matters, and maintaining a passport;

- exclusive right to schedule medical and therapeutic appointments for the child, except in an emergency while Spence has possession;

- exclusive right to determine the child's residence within Travis County, Texas, and its contiguous counties; and

- child support of zero dollars, and no obligation to pay Spence child support.

The court renewed Smith's appointment as parenting facilitator for an additional year and issued a permanent injunction replacing the personal-conduct orders provision in the 2019 Order.

### A.   Departure from standard possession order

Spence challenges the trial court's findings and conclusions supporting its award to her of somewhat less than standard possession. She contests the sufficiency of the evidence to support Finding 31 that the 2019 Order's equal possession terms are unworkable or inappropriate under the totality of the circumstances; Finding 32 that limiting her possession time with the child limits the different scenarios under which the child will be exposed to her lying and manipulative behavior; Finding 33 that limiting her possession time with the child increases the time during which Davis can meet the child's serious developmental, social, emotional, and other needs; and Finding 34 and part of Conclusion 15, both stating that the schedule limits Spence's

30

possession only to the extent necessary to protect the best interest of the child. She challenges Conclusion 13 that Davis rebutted the presumption that the standard possession order (SPO) set out in Texas Family Code section 153.312 is in the best interest of the child and Conclusion 15 that deviation from the SPO is in the child's best interest.

Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child by each of the joint conservators, but there is a rebuttable presumption that the SPO provides reasonable minimum possession of a child for a parent named joint managing conservator and is in the best interest of the child. *See* Tex. Fam. Code §§ 153.135, .252. When ordering terms other than the SPO, the trial court must consider the guidelines of the SPO and may consider (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor. *Id.* § 153.256.

Spence does not detail the departures from the SPO, but our review of the record reveals three deviations. During the school year, she has the child on Thursdays from the end of school until 6 p.m. that same day, plus the first, third, and fifth weekends from Friday at the end of school until 5 p.m. on Sunday. During the summer, she is entitled to one fourteen-day period of possession. By contrast, under the SPO, Thursday possession is from 6 p.m. to 8 p.m., weekend possession begins at 6 p.m. on Friday and lasts until 6 p.m. on Sunday, and the extended summer possession lasts thirty days with slightly earlier than usual notice required for designating the dates for that possession. *See id.* § 153.312.

The trial court did not abuse its discretion by awarding the modified Thursday and weekend possession times because the modifications reasonably address concerns in the record

about minimizing disruption to the child from possession exchanges. The record is replete with evidence of the parties' difficulties in exchanging possession that did not occur before the 2019 Order. Though the disputes appeared to reduce as time passed, evidence supports that they are a material and substantial change in circumstances. The Thursday schedule eliminates one change in possession by having Spence pick up the child from school instead of having Davis pick up the child, cede possession to Spence at 6 p.m., then retake possession at 8 p.m. Similarly, on Fridays of Spence's weekend possession, she takes possession at the end of school, and her possession is uninterrupted until one hour earlier on Sunday than under the SPO; this avoids a Friday after-school exchange of possession and accords Spence longer weekend possession even with the earlier Sunday exchange. Evidence supports that these changes are in the child's best interest.

The trial court did not abuse its discretion by reducing the length of Spence's extended summer possession. While there is evidence that Spence lied and manipulated before the 2019 Order, factually sufficient evidence supports a finding that since that order her lies began to involve and affect the child who by then had greater capacity to be aware of them. The court is within its power as factfinder to draw reasonable inferences from the evidence, and evidence that the child is attempting to breastfeed a year after he was supposedly weaned supports a finding that Spence exposed the child to dissonance between his lived experience and the version of events told to others; evidence showed that such dissonance was harmful to the child independently of whether Spence lied directly to him. The evidence that he is more dysregulated after her possession developed after the 2019 Order awarded Davis greater possession, as did evidence that the child performed better in therapy when at Davis's home and after his possession periods than he did when at Spence's home or after her possession.

32

Factually sufficient evidence supports Finding 31 that the evenly split possession was inappropriate, Finding 32 that the limitation of the summer period reduces the different scenarios under which the child will be exposed to Spence's lying and manipulative behavior, and Finding 33 that limiting her possession increases the time during which Davis can meet the child's serious needs.

The trial court did not abuse its discretion by reaching Conclusion 13 that the presumption that the SPO is in the best interest of the child has been rebutted or Conclusion 15 that deviation from the SPO is in the child's best interest. The trial court did not abuse its discretion by making Finding 34 that its order limits Spence's possession only to the extent necessary to protect the best interest of the child.

### B. Exclusive right to make decisions for child after meaningful consultation

In Findings 35 and 36, the court stated that awarding Davis exclusive decision-making rights and the exclusive right to schedule medical appointments (except in emergency) and therapeutic appointments—all after meaningful consultation with Spence—was in the child's best interests. Spence argues that these findings are not supported by sufficient evidence and do not represent a material and substantial change.

Davis testified that, even with parenting facilitator Smith's help, the parties took six months to agree on an individual therapist and that their indecision caused them to miss a window for a neuropsychological evaluation. Concerning the first proposed evaluator in June 2020, Davis testified that Spence scheduled an appointment and filled out intake paperwork before informing Davis about the appointment. Davis asked to review Spence's comments on the intake paperwork, but Spence said she did not have the form, then in a later message said she filled out her paperwork with a pen, which she said would prevent Davis from filling it out.

33

When Davis replied that he wanted to add his perceptions for the doctor, to avoid providing separate paperwork and ultimately to have a productive process, he said he would share his intake paperwork and still hoped to see Spence's document. Spence replied, "Lol." When Davis questioned that response, Spence replied:

> To be clear, I always find the stories you write to me very clownish, and it's healthy to laugh when things are funny. Something so simple as intake forms forgotten to be shared, that you could easily ask for from the office yourself, turns into a tale of interference and victimization.
>
> Something so simple as filling out double forms turns into your insistence that you be shared the same forms to....write in the margins.
>
> Something so simple as two forms turns into you insinuating a Ph.D. can't read two of and understand both households concerns….
>
> So I laugh. You so silly.

(ellipses in original). Davis testified that the evaluator's office was initially reluctant to share Spence's form because of Health Insurance Portability and Accountability Act (HIPAA) privacy concerns but eventually provided the form. The parents then could not agree on how they both could participate in the appointment; COVID restrictions permitted only one parent to attend in person, and Spence rejected Davis's offer to participate by video or for each parent to attend half the appointment.

Spence challenges Finding 14(k) that Spence did not follow Crouse's recommendations for scheduling the child's appointments and made scheduling appointments difficult at times. OFW message threads in evidence show a conversation about scheduling that concerned scheduling around summer camps and both parents' vacations and camps. A thread also tracks Spence's request to discuss Crouse's determination that the child needed only one

34

weekly appointment in light of the recommendation by Bunner that the child have two weekly occupational therapy appointments to prepare for kindergarten. The parents discussed how many appointments the child missed and why, though Spence did not in the exhibits admitted explain why the child missed one of the appointments during her possession time. The process also included errors by the therapist's scheduler regarding availability. Crouse wrote that she had reviewed Bunner's recommendation but determined that, in light of progress in over two years of therapy, the child needed only one session per week. Crouse testified that she was pulled out of providing therapy to get involved in a scheduling dispute between the parents, which she said does not happen with a lot of patients. The parties had differing views of events, but factually sufficient evidence supports Finding 14(k).

Spence argues that the record does not show a material or substantial change from the 2019 Order. But the parties agreed in 2019 not to appoint a primary parent and to share the decision-making as to medical, dental, surgical, invasive, psychological, psychiatric, educational issues and all other rights and duties and that those arrangements were in the child's best interest. Davis testified that the coparenting that occurred was not what he envisioned when agreeing to the MSA. There is evidence that Spence resisted cooperating with Davis in seeking and attending an evaluation and that the parents' difficulties in reaching agreement was unusual and pulled the occupational therapist away from treating other patients. Evidence also showed that Davis's observations of the child's abilities are more aligned with the child's therapist's observations and that the child's behavior is better regulated when he is with Davis. Factually sufficient evidence supports finding that circumstances changed meaningfully and substantially since the 2019 Order and that awarding Davis exclusive decision-making and appointment-scheduling rights was in the child's best interest, supporting Findings 35 and 36.

### C.  Geographic restriction

Davis requested that the geographic restriction clause of the order that limits where he can establish the child's residence be modified.  The 2019 Order establishes the site of the child's residence as Travis County, Texas, and denies both parents the right to establish the child's residence elsewhere absent court order or signed agreement filed by the parties, while the 2022 Order allows Davis the right to establish the child's primary residence and to move with the child to any of the counties contiguous to Travis County, Texas, and lifts the restriction entirely if Spence moves away from Travis County, Texas.

The change in granting Davis the exclusive right to establish the child's primary residence is consistent with Finding 9 that Davis is best able to meet the child's needs, which we have found supported by sufficient evidence.  Allowing the child's residence to be in Travis County, Texas, is not a change from the 2019 Order.

But no evidence supports expanding the size of the geographic range for the child's residence to include contiguous counties.  Davis testified that he does not plan to move away from Travis County, Texas, which does not support expansion of the geographic range.  Because no evidence supports a change in circumstance that supports the expansion of the geographic region in which Davis can establish the child's primary residence, we conclude that the trial court abused its discretion by modifying the previous order in that respect, sustain Spence's issue in this regard, and modify the 2022 Order to reinstate the prior restriction of the child's residence to Travis County, Texas.

### D.  Child support

Spence does not dispute determinations that, because Davis waived his right to receive monthly child support and the parties' incomes are largely disparate, application of the

percentage guidelines would be unjust (Finding 37), nor does she contest the conclusion that her paying no child support is in the child's best interest (Conclusion 20). She contests Conclusion 19 that terminating Davis's obligation under the 2019 Order to pay child support and to maintain a life-insurance policy on himself is in the child's best interest. She contends that there has been no material or substantial change in circumstances and argues for the continuation of the terms of the MSA and 2019 Order under which she received $3,000 per month in child support.

Though the parents' incomes remain disparate, we have concluded above that factually sufficient evidence supports finding that there has been a material and substantial change in the child's circumstances, and the shift in the proportionate time of possession means the child will spend more time with Davis compared to the even split awarded by the 2019 Order. The record shows that Spence has income to support the child during her possession time. Factually sufficient evidence supports Conclusion 19 that terminating Davis's obligation to pay Spence child support is in the child's best interest.[10]

E. **Appointment of a parenting facilitator**

The trial court in 2019 ordered that the parents use a parenting facilitator to help them address issues affecting the child. It later appointed Leslie Smith as facilitator. The 2022 Order renews that appointment and describes the facilitator's duties as it did in the 2019 Order.

Spence contends that there is a conflict between Finding 23 that Davis attempted, "unsuccessfully for the most part, to collaborate with MOLLY SPENCE about parenting issues on Our Family Wizard and in parenting facilitations sessions" and Finding 38 that "it appeared to

---

[10] Spence challenges Conclusion 18 that awarding Davis the exclusive right to receive child support is in the child's best interest, but review of that conclusion is unnecessary because the court awarded no child support.

the Court as though Leslie Smith was effective with both parents and that the parents had previously agreed to work with her." Though there was evidence of disagreements in the need for facilitations, scheduling facilitations, setting the agenda for facilitations, communication during the facilitations, and reaching resolutions, we need not determine whether sufficient evidence supports the portion of Finding 23 regarding the success of facilitation. Any error in that finding is harmless because factually sufficient evidence supports Finding 38 and Conclusion 23 that Smith should be appointed as the parenting facilitator because this is a high-conflict case and Leslie Smith has previously worked well with the family. The trial court did not abuse its discretion by extending the facilitator requirement or by reappointing Smith.

### F.    Permanent injunction

Spence contends that Conclusion 21, which provides that the evidence supports imposition of a permanent injunction, conflicts with the MSA provision that does not impose a permanent injunction and includes the personal-conduct order from the parties' California order and the child's bill of rights. She argues that the modification is not supported by a material and substantial change of circumstances.

The MSA provides that the California orders are superseded except for "the injunctions from the personal conduct order which will be incorporated into an Agreed Final Order." In relevant part, the 2019 Order enjoins the parties from contacting in any way the family, friends, significant others, and business associates of the other party and bars the parties from having in-person contact except for custodial exchanges. The 2022 Order deletes provisions prohibiting stalking or similar activities (which Davis had requested in 2019 because of Spence's actions that had not persisted) but retains provisions against disparagement of the other parent; it also enjoins the parents from going within 150 yards of the other party or their

significant other, their residence, or their place of employment except to facilitate exchanges but allows proximity to attend the child's appointments or educational/extracurricular events and appointments with the parenting facilitator.

Testimony indicated that the child's aging and progression into kindergarten would entail more public events that parents might attend and that having both parents and their significant others attend those events civilly would benefit the child. We cannot say that the trial court abused its discretion by concluding both that this evidence demonstrates a change in circumstances and that the 2022 terms are in the child's best interest. We find no legal barrier to or abuse of discretion in the trial court's imposition of a permanent injunction in the 2022 Order.

## CONCLUSION

We sustain in part and overrule in part Spence's sole issue on appeal. The trial court abused its discretion by expanding the permissible location of the child's residence to include counties contiguous to Travis County, Texas, in its Final Order in Suit to Modify the Parent-Child Relationship signed January 10, 2022. We modify the residence provision on page four of the order by striking the language "and contiguous counties" and any other similar provisions. Finding no other abuse of discretion presented, we affirm the order as modified.

_____

Darlene Byrne, Chief Justice


Before Chief Justice Byrne, Justices Triana and Smith

Modified in Part, Affirmed as Modified

Filed:   January 27, 2023

39